PRESENT: All the Justices

RAE LEE DAVIS

v. Record No. 181192

J. GARNETT DAVIS, JR., ET AL.

OPINION BY
JUSTICE S. BERNARD GOODWYN
December 5, 2019

FROM THE CIRCUIT COURT OF WYTHE COUNTY
Josiah T. Showalter, Jr., Judge

In this appeal, we consider whether a power of attorney document provided an attorney-in-fact with the authority to gift a principal's real and personal property.

## I. BACKGROUND

Samuel Dickey Davis (Dickey) trained horses for most of his life at his family's farm in Wytheville, Virginia. In 1993, when he was in his late forties, Dickey suffered an accident that left him a quadriplegic.

After the accident, on September 25, 1993, Dickey signed a durable power of attorney document giving his mother, Agnes Davis (Agnes), the power to

> transact for [Dickey], in [his] name, place and stead, all business for [Dickey] that [he] could do if acting personally; to endorse checks, write checks, make deposits in banks or other financial institutions . . . to receive any monies due [to Dickey] and receipt for the same, to renew any savings account, certificate of deposit or other time deposit; *to sell and convey any and all personal property and all real property* [Dickey] may own and execute and deliver an instrument for the same; . . . and *to execute and perform all and every act or acts*, thing or things in law needful and necessary to be done in and about [Dickey's] affairs, as fully, largely and amply, and *to all intents and purposes whatsoever as* [*Dickey*] *might or could do if acting personally* . . . .

(Emphases added.)

Agnes subsequently added an addition to her house to accommodate Dickey. After returning from the hospital, Dickey moved into the addition, and Agnes, along with Susan Goforth (Susan) who is Agnes' daughter and Dickey's sister, began tending to Dickey's physical

1

and medical needs on a daily basis. Rae Lee Mills (Rae),[1] who had been working on the family farm as an employee, also eventually began to help take care of Dickey.

On April 21, 2005, Dickey executed a will that named Garnett Davis (Garnett), who is Dickey's brother, as executor. Under the terms of his will, Dickey bequeathed to Agnes all of his household furnishings and gave Garnett the proceeds of the sale of "the property which I inherited from the J. Garnet Davis Estate." He also gave the sale proceeds from one of his houses to the Wytheville Presbyterian Church, and left Rae several parcels of his real estate, his horse equipment, his trucks, and all money and bank deposits he held on the day of his death.[2] He left the residue of his estate to Garnett. Rae, Agnes, Garnett, and Susan were unaware of the will at the time of its execution.

In August 2010, Rae moved into Dickey's home in order to continue tending to him. In May 2013, Dickey fell ill. He was hospitalized and subsequently moved to Greystone Healthcare Center (Greystone), which is a nursing facility in Tennessee. Between August and October 2013, Dickey suffered brief periods of confusion because of his illness.

During the period that Dickey was at Greystone, Rae and Dickey contemplated marriage. Without contacting Agnes and without any of the Davis family present, Dickey and Rae got married on October 1, 2013, in a closed-door ceremony conducted in Dickey's room at Greystone. On October 15, 2013, Agnes learned of the marriage from a friend who noticed that Rae had changed her last name from Mills to Davis on a popular social media website.

---

[1] Rae is now known by her married name, Rae Lee Davis.

[2] Dickey named other beneficiaries in his will. These beneficiaries have disclaimed their interests and are not relevant to this appeal.

Later in October, Dickey's medical condition worsened and he was transferred to a hospital. On October 25, 2013, Dickey triggered a "code blue," which indicated that he was incapacitated and in jeopardy of dying. The hospital staff informed Dickey's family members, including Agnes, of Dickey's condition.

On October 31, 2013, using the power of attorney Dickey had given her, Agnes transferred the vast majority of Dickey's personal property to herself. She also executed three deeds of gift transferring all of Dickey's real property to Susan and Garnett. The value of the property subject to these transfers was over $2 million. Agnes did not inform Dickey of these transfers. Dickey subsequently passed away on November 15, 2013.

On February 10, 2016, Garnett, in his capacity as executor of Dickey's will, filed a complaint in the Circuit Court of Wythe County on behalf of Dickey's estate (Estate). The complaint requests the circuit court's aid and direction regarding the validity of Agnes' transfers of Dickey's property just prior to his death and the interpretation of Dickey's will; more particularly it requested interpretation of the phrase "property which I inherited from the J. Garnet Davis Estate" used in the will. Susan, Agnes, Garnett in his individual capacity (collectively, the Family), Rae, and Wytheville Presbyterian Church are named as defendants in the lawsuit.

The circuit court held a bench trial in February 2017 to determine whether Agnes' transfers of Dickey's property were validly authorized by the power of attorney document Dickey signed. At trial, the Family submitted a November 19, 2015 deposition of Agnes into evidence. In the deposition, Agnes testified that she learned of Dickey's will in 2008, but she did not know of its contents. She stated the will surprised her because Dickey "wasn't in the mood of giving [his property] to anybody" and Dickey had previously told her that he wanted his

3

property to go to the Davis family.  She testified that she executed the transfers of Dickey's property to protect it for Dickey and to have it in "safer hands" until things cleared up with his health.

The Family also called Burt Honaker (Burt), Rae's son from a prior marriage, who testified that Dickey gave him a 90-year lease on one of Dickey's properties in 2008.  Burt made a one-time payment of $1,000 for the lease, and testified that he is responsible for and has paid taxes on the leased property.  Burt also testified that, when he sought a loan to build a barn on the leased property, Dickey allowed the leased property to be used as collateral for the loan.

Garnett also testified on behalf of the Family, stating that he remembered that Dickey wrote him a check once for $10,000 as a gift some time "between 1990 and forward."  He recalled that it "might have been before [Dickey] got hurt."  Garnett admitted that Dickey had never transferred or given any other property to him.

At the conclusion of the evidence, the circuit court directed the parties to submit their closing arguments in written briefs.  In her closing argument brief, Rae contended that Dickey's power of attorney did not authorize Agnes' transfers.  She argued that Agnes' authority to "sell and convey" Dickey's property does not include the power to make gifts.  Rae further contended that, even if the power of attorney authorized Agnes' transfers, Code § 64.2-1638(B) limits such gifts to $14,000 per person per year, and the value of the property in Agnes' transfers grossly exceeded that amount. The Family submitted a brief arguing that Agnes' transfers were valid under the power of attorney document's grant of authority to Agnes to "sell and convey" Dickey's property.

On July 13, 2017, the circuit court sent the parties a letter opinion holding that the property transfers made by Agnes were valid.  It concluded that Agnes was authorized by the

4

language in the power of attorney to "sell and convey" Dickey's property, which allowed her to gift Dickey's property. Additionally, the circuit court concluded the power of attorney document and Code § 64.2-1622(H) gave Agnes authority to make gifts in accordance with Dickey's donative history. The circuit court found that Dickey "had a personal history of making lifetime gifts," which included the 90-year lease to Burt for "little to no consideration," the collateral he offered to support Burt's loan, and the $10,000 Dickey gave Garnett, and the court found Agnes' transfers of Dickey's real and personal property were in accordance with that personal history of lifetime gifts. The circuit court ruled that the gift-giving limit in Code § 64.2-1638(B)(1) did not apply to Agnes' Code § 64.2-1622(H) authority.

Additionally, the circuit court found that Dickey's will was valid. It concluded that Agnes was aware of the will's existence as of 2008, but did not know its contents.

On November 21, 2017, the circuit court entered an order awarding judgment in accordance with its letter opinion. The circuit court also held that, in light of its rulings, the issue as to the meaning of the phrase "property which I inherited from the J. Garnet Davis Estate" and any other remaining issues concerning distribution under the will were moot because no property was left in Dickey's estate.

Rae appeals. We granted three assignments of error:

1. The Circuit Court erred in holding that the Power of Attorney - which does not mention gifts - expressly authorized Agnes Davis, attorney-in-fact, to make gifts of substantially all of Dickey Davis's real and personal property.

2. The Circuit Court erred in finding that Agnes Davis's transfers of substantially all of Dickey Davis's real and personal property was in accordance with his prior gift-giving history.

3. The Circuit Court erred in holding that Dickey Davis's "donative history," together with the broad authority conferred by the Power of Attorney, authorized Agnes Davis, as attorney-in-fact, to give away substantially all of Dickey Davis's real and personal property.

5

II. ANALYSIS

A circuit court judgment "shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Code § 8.01-680; *Grubb v. Grubb*, 272 Va. 45, 54 (2006). Where there are mixed questions of fact and law, "we give deference to the trial court's factual findings and view the facts in the light most favorable to the prevailing party, but we review the trial court's application of the law to those facts de novo." *Tuttle v. Webb*, 284 Va. 319, 324 (2012) (alterations, citation, and internal quotation marks omitted).

This appeal raises two issues. First, did the language in Dickey's power of attorney document expressly authorize Agnes' gifting of Dickey's real and personal property? Second, did Code § 64.2-1622(H) otherwise authorize Agnes' transfers?[3]

A. Express Gifting Authority in the Power of Attorney Document

If an attorney-in-fact makes a transaction with the principal's assets to the benefit of the attorney-in-fact, such transaction is "presumptively fraudulent." *Grubb*, 272 Va. at 53. This presumption operates "independently of any evidence of actual fraud . . . and is intended to

---

[3] We have long held, consistent with the view taken in our sister states, that a power of attorney is contractual in nature. *See Hotchkiss v. Middlekauf*, 96 Va. 649, 653 (1899); *Ruffners v. Putney*, 53 Va. 541, 551 (1855). Similarly, it is also well established in Virginia that the law in force at the date of making a contract determines the rights of the parties under the contract, *Citizens Mut. Bldg. Assoc. v. Edwards*, 167 Va. 399, 404 (1937), and that "[t]he law effective when the contract is made is as much a part of the contract as if incorporated therein." *Maxey v. American Cas. Co.*, 180 Va. 285, 290 (1942). However, when the General Assembly enacted the statutes comprising the Uniform Power of Attorney Act in 2010, *see* 2010 Acts chs. 455, 632, it specifically provided in Code § 64.2-1642(1) that "on July 1, 2010" the provisions of the Act "appl[y] to a power of attorney created before, on, or after July 1, 2010." Accordingly, although the power of attorney involved in this appeal was executed in September of 1993, the provisions of the statutes currently governing the construction and interpretation of powers of attorney, as set out in Code §§ 64.2-1600 through -1642, apply, rather than the law in effect at the time that the power of attorney was executed.

protect the [principal] from the influence naturally present in such a confidential relationship."

*Id.* at 54. Once this presumption is established, the burden of production shifts to the attorney-in-fact to produce "clear and convincing evidence to rebut the presumption." *Id.* at 53; *see Ayers v. Shaffer*, 286 Va. 212, 224–26 (2013) (noting that presumptions arising from self-dealing in confidential relationships shifts the "burden of going forward with the evidence"); *see also Parson v. Miller*, 296 Va. 509, 524–28 (2018) (explaining the distinction between presumptions that shift the burden of production and presumptions that shift the burden of persuasion).

Agnes' gifting of Dickey's personal property to herself warrants the presumption of fraud. At trial, Agnes sought to rebut the presumption of fraud by relying on Dickey's power of attorney document as authority for her transfers of Dickey's property to herself and her children. Although the transfers to her children, Susan and Garnett, do not warrant a presumption of fraud, the validity of Agnes' assignment to herself, as well as her transfers to her children, turns on whether Agnes' transfers of Dickey's property were authorized by Dickey's power of attorney document.

We review the legal effect of a written power of attorney document de novo. *Jones v. Brandt*, 274 Va. 131, 135 (2007). In interpreting a power of attorney document, we employ both statutory principles from the Uniform Power of Attorney Act (Act), Code § 64.2-1600 *et seq.*, and common law principles. Code § 64.2-1619 (recognizing that "the principles of law and equity" supplement the Act).

Under the Act, an attorney-in-fact has the authority to make gifts on behalf of the principal "*only if* the power of attorney *expressly grants* the agent the authority and exercise of the authority is not otherwise prohibited or limited by another statute, agreement, or instrument to which the authority or property is subject." Code § 64.2-1622(A)(2) (emphases added).

7

Under the common law, powers of attorney "are to be construed in accordance with the intention of the donor, or grantor, that intention to be gathered in general from the instrument itself." *Davis v. Kendall*, 130 Va. 175, 198 (1921) (citation and internal quotation marks omitted). Language in a power of attorney instrument is "strictly construed." *Jones*, 274 Va. at 137. Additionally, language in a power of attorney document "must be given its obvious meaning no matter what rule of construction is adopted." *Walker v. Temple*, 130 Va. 567, 570 (1921). When examining the power of attorney document to determine the existence of express authority, we thus strictly construe the document's language and give its terms their obvious meaning. *Jones*, 274 Va. at 137; *Walker*, 130 Va. at 570.

A power of attorney document must expressly grant the authority to make gifts. Code § 64.2-1622(A)(2). In the present case, the Family and the Estate point to Agnes' authority to "sell and convey" Dickey's property, stated in the power of attorney document, as an express grant of authority for Agnes to make gifts on Dickey's behalf. In other words, the Family and the Estate claim that by authorizing Agnes to "sell and convey" Dickey's personal and real property, the power of attorney expressly authorized Agnes to, in her discretion, gift any such property.

To "sell" means to "transfer (property) by sale." Black's Law Dictionary 1634 (11th ed. 2019). To "convey" is to "transfer or deliver (something, as a right of property) to another, esp. by deed or other writing." Black's Law Dictionary 421 (11th ed. 2019). There is little Virginia case law interpreting the phrase "sell and convey."

In *Pratt v. Taliaferro*, 30 Va. (3 Leigh) 419, 421 (1832), we examined a will that devised land to the executors of the will "that they may sell and convey" the land and "that the produce of the sale be equally divided between her daughter and grand daughter." (Emphasis omitted.)

8

We concluded that this language "impress[ed] upon it *the character of money*." *Id.* at 421–22 (emphasis added). *Pratt* therefore suggests that the phrase "sell and convey" contemplates transfers for adequate consideration.

Similarly, in *Whitford v. Gaskill*, 480 S.E.2d 690, 691 (N.C. 1997), the Supreme Court of North Carolina noted that a

> power of attorney authorizing an agent *to sell and convey property*, even though it authorizes him to sell for such price and on such terms as to him shall seem proper, *implies a sale for the benefit of the principal, and does not authorize the agent to make a gift of the property*, or to convey or transfer it without a present consideration inuring to the principal.

(Emphases added) (citation and internal quotation marks omitted). It held, however, that a provision giving an attorney-in-fact "the power to transfer [] real estate" included the power to gift such real estate. *Id.* at 692 (internal quotation marks omitted).

In *Casey v. Commissioner*, 948 F.2d 895, 896–97 (4th Cir. 1991), the Fourth Circuit analyzed a power of attorney document that specifically authorized the attorney-in-fact "to lease, sell, grant, convey, assign, transfer, mortgage and set over to any person, firm or corporation *for such consideration as he may deem advantageous*, any and all of [the principal's] property." (Emphasis added.) The Fourth Circuit concluded that such language did not include the power to make gifts because the power is qualified by the phrase "for such consideration," which contemplated transfers for value and not gifts. *Id.* at 901 (internal quotation marks omitted).

Here, Dickey's power of attorney authorized Agnes to "sell and convey any and all personal property and all real property [Dickey] may own and execute and deliver an instrument for the same." The phrase "sell and convey" is a legal doublet that reflects the typical process for real estate transactions: a contract of sale, and the closing and passing of title by deed. Because we construe powers of attorney strictly and Code § 64.2-1622(A)(2) requires a power to

9

be "expressly granted," "sell and convey" should be construed narrowly. Strictly construed and employing its obvious meaning, "sell and convey" does not include the authority to make gifts or transfers for inadequate consideration. Like in *Pratt* and *Whitford*, the phrase contemplates that a transfer must be for adequate consideration, and thus it does not expressly authorize the gifts of Dickey's property granted by Agnes.

Although "convey," standing alone, includes the ability to make gifts, Agnes only has the authority to "sell *and* convey" Dickey's property. The Family and the Estate read the term "convey" in isolation, arguing that Agnes had the authority to convey Dickey's property without selling it. The Family and the Estate therefore construe the "and" as an "or" to mean that Agnes' execution of one term ("convey") does not require execution of the other ("sell"). Such a construction alters the obvious meaning of "and," extending Dickey's power of attorney document "beyond the terms in which it is expressed" and violating the strict construction required for powers of attorney. *See Jones*, 274 Va. at 137.

Moreover, there is a presumption that contracting parties have not used words needlessly, and we will not treat a word as meaningless if a reasonable meaning can be given to it. *D.C. McClain, Inc. v. Arlington Cty.*, 249 Va. 131, 135–36 (1995). To hold that "convey" includes both transfers for consideration and gifts would leave the term "sell" redundant and meaningless. Because the plain meaning of "sell and convey" does not include the power to make gifts, the circuit court erred in holding that this phrase expressly authorized Agnes' gifting of Dickey's property.

Further, assuming arguendo that Dickey's power of attorney expressly authorized Agnes' transfers, the circuit court erred in refusing to apply the gift limits prescribed by Code § 64.2-1638. If a power of attorney document grants an attorney-in-fact the authority to make gifts,

10

Code § 64.2-1638(B)(1) limits the amount of such gifts per donee to the annual dollar limits of the federal gift tax exclusion under 26 U.S.C. § 2503(b) in the Internal Revenue Code, absent language in the power of attorney document to the contrary. That federal tax statute allows up to a $10,000 value for gift exclusions, multiplied by a cost-of-living inflation adjustment. 26 U.S.C. § 2503(b). In the present case, the cost-of-living adjustment results in a gift limit of approximately $14,000 per recipient in 2013. Thus, even if Agnes was expressly authorized to gift the property, the circuit court erred in not applying this $14,000 per recipient limit to the over $2 million of property that Agnes transferred to herself and her surviving children.

Because the "sell and convey" language, strictly construed, is not an express grant of authority to Agnes to make gifts or other transfers for inadequate consideration, the circuit court erred in holding that Dickey's power of attorney expressly authorized Agnes to give away Dickey's real and personal property.

### B. Gifting Authority Under Code § 64.2-1622(H)

Code § 64.2-1622(H) provides:

> if a power of attorney grants to an agent *authority to do all acts that a principal could do, the agent shall have the authority to make gifts* in any amount of any of the principal's property to any individuals . . . *in accordance with the principal's personal history* of making or joining in the making of *lifetime gifts*.

(Emphases added.)[4] In other words, this statute allows a circuit court to infer an attorney-in-fact's authority to give gifts, in certain circumstances, even when such authority is not explicitly

---

[4] This statutory provision applies only if a power of attorney gives an attorney-in-fact the authority to "do all acts that a principal could do." Although Dickey's power of attorney gave Agnes the authority to "execute and perform all and every act or acts, thing or things in law needful and necessary to be done in and about [Dickey's] affairs . . . as [he] could do if acting personally," the "affairs" mentioned in the document concern Dickey's finances and businesses. The document begins by giving Agnes the authority "to transact . . . all *business*" for Dickey, such as endorsing and writing checks, making deposits, withdrawing funds, and receiving money owed to Dickey. The power of attorney document's full context therefore suggests that Agnes

11

set forth in the power of attorney document, as long as those gifts are "in accordance with the principal's personal history of making . . . lifetime gifts." *See id.*

Statutory interpretation is a question of law we review de novo. *Virginia Polytechnic Inst. & State Univ. v. Interactive Return Serv., Inc.*, 271 Va. 304, 309 (2006). "When the language of a statute is plain and unambiguous, we are bound by the plain meaning of that statutory language." *Lee Cty. v. St. Charles*, 264 Va. 344, 348 (2002). In construing the Uniform Power of Attorney Act, "consideration shall be given to the need to promote uniformity of the law with respect to its subject matter among the states that enact it." Code § 64.2-1640.

We have not previously addressed the application of Code § 64.2-1622(H) to a principal's personal history of making lifetime gifts. In *Casey*, the Fourth Circuit considered whether a gift made pursuant to a power of attorney was in accordance with the principal's "pattern of gifts." 948 F.2d at 901. There, the principal's husband designed an estate plan to minimize his estate tax liability by making annual gifts of real property to his children. *Id.* at 897. The principal joined in her husband's plan by releasing her dower interests in the real property gifted to the children. *Id.* After the husband's death, the principal became incapacitated, and the attorney-in-fact made gifts of money and real property to these same children on her behalf. *Id.* The Fourth Circuit held that these gifts were not in accordance with the principal's pattern of releasing her dower interests in the real property gifted by her husband to their children. *Id.* at 901–02. The court noted that the principal's prior gifts were not of property but were "simply joinders in conveyances to release her dower interests." *Id.* at 901.

---

did not have the authority to do "all acts" on Dickey's behalf, but only those acts pertaining to managing Dickey's financial and business affairs. No party raised this argument. We therefore will assume without deciding that Code § 64.2-1622(H) applies to Dickey's power of attorney.

12

In *Ridenour v. Commissioner*, 36 F.3d 332 (4th Cir. 1994), the Fourth Circuit distinguished *Casey*. In *Ridenour*, the principal "had a history of making gifts to his family that were in part tax driven," including gifting real estate, life insurance policies, stocks, cash, and regular Christmas and birthday gifts. *Id.* at 333. Once the principal became incapacitated, the attorney-in-fact made cash transfers to the principal's same family members, which included the attorney-in-fact, in order to reduce the principal's estate tax liability. *Id.* The Fourth Circuit held that these cash transfers were consistent with the principal's history of gift-giving to avoid tax liability. *Id.* at 335. Given the principal's prior intent to avoid tax liability and the broad authority in the power of attorney document to manage the principal's affairs, the Fourth Circuit concluded that the principal "would have been likely to make the gifts himself had he been capable of doing so." *Id.*

We find the methods of analysis in *Casey* and *Ridenour* persuasive. When making a Code § 64.2-1622(H) determination concerning whether gifts given by an attorney-in-fact pursuant to a power of attorney are in accordance with the principal's personal history of making or joining in the making of lifetime gifts, a circuit court must compare the factual similarities between the principal's prior lifetime gifts and the gifts made by the attorney-in-fact. The factors the court should consider to determine if the attorney-in-fact's gifts are in accord with the principal's prior lifetime gifts may include, but are not limited to, the purpose, nature, frequency, amount, and recipients of the principal's prior lifetime gifts compared to the gifts made by the attorney-in-fact.

At issue in the present case are Agnes' transfers of practically all of Dickey's personal and real property to herself, Susan, and Garnett. In concluding that Agnes' transfers were in accordance with Dickey's personal history of making gifts, the circuit court relied on three

13

purported gifts Dickey had made in the past: a 90-year lease of one of Dickey's properties to Burt, Dickey's offering of the leased property as collateral to secure Burt's loan to build a barn on the leased property, and a $10,000 cash transfer Dickey made to his brother Garnett, at some unspecified time in the past. The circuit court erred in concluding that the gifts made by Agnes were in accordance with the prior purported gifts given by Dickey. We will first address the three purported gifts.

It is questionable as to whether the 90-year lease and the agreement to allow the leased premises to be used as collateral to build a barn on the property were gifts. Whether a transaction is a gift is a question of law we review de novo. *Smith v. Mountjoy*, 280 Va. 46, 53 (2010). A gift is a contract absent consideration. *Id*. "Consideration is, in effect, the price bargained for and paid for a promise. It may be in the form of a benefit to the party promising or a detriment to the party to whom the promise is made." *Id.* (citation and internal quotation marks omitted). Mutual promises between contracting parties constitute adequate consideration, *Price v. Taylor*, 251 Va. 82, 85 (1996), regardless of the "extent the promisor is benefited or how little the promisee may give for the promise." *Brewer v. First Nat'l Bank of Danville*, 202 Va. 807, 815 (1961).

Dickey received consideration for the 90-year lease. Burt paid $1,000 for the lease, and he also agreed to pay, and actually paid, the taxes on the leased property, which Dickey was otherwise obligated to pay as the owner of the property. Likewise, as the owner of the land that the barn was built upon, Dickey received some benefit from a barn, paid for by Burt, being built on Dickey's property.

Burt received the benefit of using the land and the detriment of paying the taxes and being responsible for building a barn. Dickey received the detriment of not having exclusive

14

possession of the leased property, and the benefit of the $1,000 payment, not having to pay the taxes on his property, and a barn paid for by Burt being built on the property. Thus, there was consideration paid for the lease and for allowing the leased property to be used as collateral. Because there was valid consideration, the 90-year lease and the use of the leased property as collateral were not gifts made by Dickey. The circuit court erred in considering those transactions to be gifts and in considering the transactions as part of Dickey's history of making lifetime gifts.

However, assuming arguendo that the lease and the use of the leased property as collateral were lifetime gifts given by Dickey, Agnes' gifts to herself, Susan, and Garnett were not in accord with these gifts given by Dickey. Unlike Agnes' gifts, the security agreement and the lease with Burt were not transfers of personal or real property. Dickey retained title to the property Burt was leasing, while Dickey did not retain title to the property that Agnes transferred. *See Casey*, 948 F.2d at 901 (holding that absolute transfers of property are not in accordance with prior gifts of releasing dower interests on property). In addition, the lease, as well as Dickey's contract to provide his leased property as collateral, benefitted Burt, and Burt was not one of the recipients of Agnes' transfers.

Agnes' transfers were also not in accordance with Dickey's $10,000 gift to Garnett. Although Dickey gave the $10,000 gift to Garnett, who was also a beneficiary of Agnes' transfers, there are no other similarities between the two transfers. The $10,000 gift was a cash transfer and not a conveyance of real or tangible personal property like Agnes' transfers. Garnett also testified that Dickey never gave him any other real or personal property, after he received the $10,000 prior to Dickey's death. Unlike the circumstances present in *Ridenour*, the prior gift to Garnett was a one-time cash transfer that did not reflect a pattern of Dickey giving gifts of real

15

or personal property to Garnett. A one-time $10,000 transfer to Garnett, who, as his brother, has known Dickey his entire life, does not constitute a gift-giving "history" between Dickey and his brother. Furthermore, the cash transfer was only made to Garnett and not to Susan or Agnes, who are the other two beneficiaries of Agnes' transfers of Dickey's property, and thus that gift in no way tends to prove any history of Dickey making gifts to Susan or Agnes.

Consideration of Dickey's personal history of gift-giving as a whole, in addition to examining Dickey's prior gifts individually, also fails to demonstrate that Agnes' transfers of Dickey's property were in accordance with Dickey's prior gifts. In fact, Dickey's history is consistent with Agnes' testimony that Dickey generally "wasn't in the mood of giving [his property] to anybody." There was no evidence at trial showing that Dickey had ever gifted his real or personal property in fee simple to anyone—much less gifted property valued over $2 million. The purpose of the gifts as explained by Agnes is not at all consistent with Dickey's alleged purposes in giving the prior purported gifts.

Agnes made the transfers days after Dickey triggered a "code blue" and was in jeopardy of dying. The nature, amount, purpose, and timing of the gifts made by Agnes makes her transfers akin to testamentary gifts, rather than "lifetime gifts" as contemplated by Code § 64.2-1622(H). *See Thomas v. First Nat'l Bank*, 166 Va. 497, 504 (1936) (defining a gift *causa mortis* or testamentary gift). Agnes testified that she made the transfers of Dickey's property to have it in "safer hands" and keep it in the family. However, there is no indication that Dickey had prior intentions to keep his property exclusively within the family. In fact, Dickey's will demonstrates that he intended to devise property to Rae and Wytheville Presbyterian Church, who were not members of the Davis family. Dickey also made presumed gifts to Burt, who is not a family

16

member. Therefore, the purpose behind Agnes' transfers is thus obviously contrary to Dickey's prior gift-giving intentions.

In short, with the exception of Garnett being a mutual recipient, Agnes' transfers shared no similarities with Dickey's prior purported gifts. There is insufficient evidence to support the circuit court's conclusion that Agnes' transfers were in accordance with Dickey's personal history of making lifetime gifts, and the circuit court erred in holding that Code § 64.2-1622(H) authorized Agnes to gift Dickey's real and personal property to herself and her two surviving children.

### III. CONCLUSION

For the foregoing reasons, we hold that the circuit court erred in holding that Agnes had the authority to execute the transfers which gifted Dickey's real and personal property to herself and her surviving children, and we rule that such transfers were invalid. The judgment of the circuit court will be reversed and vacated, and the case remanded for the circuit court to address the remaining issues regarding the interpretation of Dickey's will, and the proper distribution of Dickey's property pursuant to the terms of his will.

*Reversed and remanded.*

17